## Charleston.

ALFRED BUCHANAN *et al. vs.* ELLICOTT REYNOLDS *et ux.*

January Term, 1871.

1. A deed given for a tract of land sold for non-payment of taxes, under chap. 37, Code of Va., 1860, which is held defective and not sufficient to show an outstanding title, because it does not appear on its face with sufficient certainty by whom the sale was made, nor that the land had, in fact, been assessed with taxes, nor for what year or years, nor the amount of the taxes with which it was charged, and for which it was sold.

2. An instruction to the jury that the foregoing deed vested title in the alleged purchaser at the tax sale, held to be erroneous.

3. A case in which there was no error in overruling a motion for a new trial based upon the affidavits of three of the jurors, as the grounds alleged in the affidavits were insufficient; they related to the view the jury had taken of the evidence in the case.

This case was an action of ejectment in the circuit court of Kanawha county. Judgment for the defendants in June, 1866. It is substantially stated in the opinion of the President.

The deed which is held insufficient to pass land sold for non-payment of taxes under the 37th chapter of Code of Virginia, 1860, is in the following language:

" This indenture, made this 29th day of April, 1865, between John Slack, Recorder of the county of Kanawha, W. Va., of the first part, and G. M. Morrison, of the same county and State, of the second part, witnesseth :

" That whereas at a public sale of delinquent lands in and for said county, then State of Virginia, at the front door of the court-house, on the 17th day of September, 1860, the county court being then in session, said lands having been returned delinquent and advertised for sale on that day by the Sheriff of said county, for the non-payment of taxes

and damages due thereon, in pursuance of the provisions of the 37th chapter of the Code of Virginia, there was offered for sale a certain tract of land, said to contain 3,766⅔ acres, delinquent in the name of James Hunter, James Humbird and J. P. Hale, situate on the waters of Rush creek, Davis creek and Kanawha river, in sheriff's receipt described as "steam mill lot" on Kanawha, in said county of Kanawha; and G. M. Morrison being the only bidder for said tract, became the purchaser thereof for the sum of 101 dollars and eight cents, being the whole amount of taxes and damages due thereon, which said sum he paid to the sheriff, taking his receipt therefor, dated on the said 17th day of September, 1860; and whereas the said sheriff made out a full and accurate list of all his sales of delinquent lands made on said day, accompanied by the proper oath, as prescribed in the said 37th chapter of the Code of Virginia, which said list and oath were filed in the clerk's office of said county, and in due time returned to the county court, and by said court certified to the auditor of the State; and whereas more than four years and a half have elapsed since said sale and purchase were made, and neither the owners nor others having redeemed or offered to redeem the land, as they could have done under the provisions of the said 37th chapter of the Code of Virginia; and the said G. M. Morrison having recently, at his own costs and expense, had a plat and report of the said land, made by A. P. Sinnett, deputy surveyor for said Kanawha county, now West Virginia, specifying the metes and bounds of said land, and the names and owners of the adjoining tracts, and accompanied by the said sheriff's receipt, as part of said report, all of which clearly identify and locate said land; and the said plat and report having been submitted to the circuit court of said county, at its April term, 1865, Hon. Daniel H. Polsley, Judge, presiding, and the said court having ordered the same to be recorded in the recorder's office of said county, and hereby referred to, together with the accompanying order, and all made part of this deed. And the said G.

M. Morrison, now being entitled to a deed of conveyance for said land under the provisions of the said 37th chapter of the Code of Virginia, and the 58th chapter of the Acts of the Legislature of West Virginia, at its first session, and passed October 7th, 1863: Now, therefore, this indenture witnesseth:

"That for, and in consideration of the premises, and the farther consideration of one dollar in hand, paid to the party of the first part by the party of the second part, the receipt whereof is hereby acknowledged, the party of the first part doth hereby grant and convey to the said party of the second part all the aforesaid tract of land, with the appurtenances thereto belonging, more particularly bounded and described as follows, to wit:" &c., "to have and to hold the said tract or parcel of land unto the said George M. Morrison, his heirs and assigns forever, and the said party of the first part doth warrant specially the land hereby conveyed.

"In testimony whereof, I, John. Slack, Recorder in and for said county of Kanawha, have hereunto set my hand and seal the day and year first above written.

"JOHN SLACK, Recorder," [Seal.]

The plaintiffs offered the affidavits of three of the jurors in support of their motion for a new trial, one of whom stated that the jury were unanimously of opinion that the title to Morrison was of no value, and that their verdict was entirely based upon the deed of the Donnallys to the defendants; in the absence of this latter, their verdict would have been for the plaintiffs. Another one stated, that the foregoing statement was correct, with the further explanation that the counsel on both sides agreed that the deed from the Donnallys to Hunter, Hale and Humbird, was invalid. A third juror said the jury first took up the deed to Hunter and others, and decided that it was invalid, as it was not denied by the counsel for the defendants; that they also regarded the deed to Morrison as invalid, and based their verdict on the deed of the Donnallys to the defendants.

The foregoing, taken in connection with the opinion of the President, will, it is thought, make apparent the points at issue.

The plaintiffs brought the case here for review.

Hon. James W. Hoge, Judge of the circuit court of Kanawah county, presided on the trial of the case.

*Smith, Hedrick* and *Fitzhugh* for the plaintiffs in error.

The second instruction should not have been given to the jury. It submits to them the determination of two intricate questions of law: 1st, whether lands had been regularly, *i. e.* legally, sold by the sheriff; 2d, whether a deed had been obtained by Morrison, and recorded according to law. It was the province of the court to determine these questions, and not the jury.

Was the sale by the sheriff regular and legal? The land delinquent for taxes was owned by James Hunter, John P. Hale and *Jacob* Humbird. In 1859, it was returned delinquent as the land of Jas. Hunter, J. P. Hale and *James* Humbrid—3,766⅔ acres, amount of taxes, 52 dollars and 28 cents. For 1859, 2,510 71-80 acres are returned delinquent in the names of James Hunter and Jacob Humbird—taxes, 34 dollars and 89 cents. The sheriff, without any authority of law, sells the title of James Hunter, John P. Hale and *James* Humbird, to pay taxes that were charged in part (52 dollars and .28 cents) to James Hunter, John P. Hale and James Humbird, and in part (34 dollars and 89 cents) to James Hunter and Jacob Humbird; thus selling, of his own motion, the land of one set of owners for the delinquency of another set of owners.

*Jacob* Humbird clearly had an interest in the land, but the sheriff's memorandum of sale does not show that his interest was sold, but it does show that the land of John P. Hale and *James* Humbird was sold for taxes charged to, and due from, James Hunter and Jacob Humbird only for the year 1859, and for taxes due on 2,510 71-80 acres, the sheriff sold 3,766⅔ acres.

But for 1858, William Steele & Co. were charged with and paid the taxes on 1,281½ acres, and John P. Hale, James Hunter and *James* Humbird were charged *for* 2,563 acres, or two-thirds of the whole, and for 1859, A. F. and Wm. Donnally are charged with 1,255, acres 71 poles, described as one-third of the 3,766⅔ acres, and William Steele & Co. are also charged with what is evidently intended for one-third of the same lands, and they paid the taxes, as far as appears by the records.

What title did Morrison acquire by his purchase? The deed, supposing John Slack to have been recorder of Kanawha county, which, by the by, is not proved, certainly did not vest him with the title of Jacob Humbird, because his title was not sold, nor with the joint title of James Hunter, John P. Hale and *Jacob* Humbird, because the title held by them jointly was not sold nor conveyed—but, according to the report of the sheriff, a joint title of James Hunter, John P. Hale and *James* Humbird, was sold. The sheriff sold the lands of James Hunter, J. P. Hale and *James* Humbird, for taxes due from James Hunter, and *Jacob* Humbird, and *vice versa;* was this a regular sale? See Code Virginia 1860, Ch. 37, § 6.

There was no proof that John Slack was the recorder. It is submitted that this is necessary. *Flannegan* v. *Grimmet, et al.*, 10 Grat., 434 and 442–3.

The laws authorizing a sale for forfeiture, should be strictly pursued, if not literally.

Where the statute under which a sale is made requires a thing to be done, or prescribes the form, time and manner of doing a thing, such thing must be done in the form and manner prescribed, or the title is invalid. And in this respect the statute must be strictly, if not literally pursued. Blackwell on Tax Titles, 310; *Chandler* v. *Spear*, 22 Vt. R., 388. Great nicety has prevailed in relation to these titles, and the inverted maxim seems to have obtained, *ut res magis pereat quam valeat. Spear* v. *Ditty,* 8 Vt. R., 419. See Blackwell on Tax Titles, 308; *Hays* ·v. *Hanson,* 12 N. H. R., 284;

*Monk* v. *Jenkins*, 2 Hill Ch. R., 12; *Register* v. *Bryan*, 2 Hawk. R., 17; *Culver* v. *Hayden*, 1 Vt. R., 359; 9 Lou. R., 546; *Sharp* v. *Johnson*, 4 Hill R., 99.

It is laid down in *Torry* v. *Milbury*, 2 Pick. R., 64, and indorsed by *Sibley* v. *Smith*, 2 Gibbs Mi. R., 498–9. "One rule is very plain and well settled, that all those measures which are intended for the security of the citizen, of insuring an *equality* of taxation, and to enable every one to know for what polls and for what real and personal estate he is taxed, are conditions precedent, and if they are not observed, he is not legally taxed." See *Corwin* v. *Merritt*, 3 Barbour S. C. R., 343; *Atkins* v. *Kinman*, 20 Wend. R., 249. The assessments made and the proceedings of the sheriffs in relation to the taxes in this case, were irregular and arbitrary, did not insure the equality of taxation, or enable the parties to know for what they were taxed.

The deed, therefore, made by the recorder, or the person representing himself as recorder, is invalid, and vested no title in Morrison for the land in controversy.

*Polsley* and *Swann* for the defendant in error.

Sec. 23, chapt. 37, Code 1860, page 221, provides that when the purchasers of real estate, sold for taxes, shall have obtained a deed, according to the six preceeding sections, such estate shall stand vested in him, as was vested in the party assessed with the taxes, &c., notwithstanding any irregularity in the proceedings, unless such irregularity appears on the face of the proceedings.

Now, the proceedings show that on the 12th day of *October*, 1857, the administrator of Andrew Donnally, deceased, sold and conveyed the land to James Hunter, John P. Hale and Jacob Humbird, and the next year, 1858, the land is *correctly described* as the land so conveyed by the administrator, and is transferred to, and assessed and charged on the commissioners' books, to James Hunter, John P. Hale and *James* Humbird. The land is correctly described as in the deed, as "two-thirds of the steam-mill lot," &c., and as *de-*

*rived from* the administrator of Andrew Donnally, deceased. The grantors are also correctly described, and the names of all the grantors are correctly stated, except as to the *Christian* name of Humbird, the *surnames* as to all are right. The sheriff's receipt to the purchaser, and also the list or return of the sheriff, also correctly described the land and the names of the owners, except as to the word *James* for Jacob; unless this is an *irregularity*, none is shown by the record. On the face of the proceedings, everything else, as to the year 1858, is regular and correct.

The land was regularly assessed in 1858, as the land transferred by Donnally's administrator, to Hunter, Hale and Humbird. The tax was regularly charged to them; the tax was not paid. The true question is, was the entry on the commissioner's books sufficiently definite, and the description of the land and of its owners, to inform them that *their* land was assessed and chargeable with the tax? It was the duty of the owners to see that their land was correctly entered on the commissioner's books, and if they failed to do so, they ought not now to be allowed to take advantage of their own wrong or negligence. The commissioner's books, the sheriff's list or return of real estate, sold by him in September, 1860, and his advertisement of the same; and also the sheriff's receipt to the purchaser, all specifically describe the land and the names of the *owners*, with sufficient accuracy. There is no irregulary in the proceedings, and none appears on the face of the deed. The land was legally assessed, it was delinquent, regularly sold, conveyed, and the title is now vested in the purchaser. The surveyor's report, which is recorded, is a part of the deed, and supplies any omission in it. The extracts from the commissioner's books given in evidence by the plaintiffs, tending to show that part of the land was taxed or charged to other persons, is irrelevent, and ought not to be admitted as evidence.

The deed from the recorder to Morrison vested the title in him. That deed cannot be collaterally assailed in a suit to which he is not a party. The only proper resort of the

owner, when the land is assessed in a wrong name and sold and conveyed to the purchaser by deed, is to a court of equity, to have the deed set aside and cancelled. *Young* vs. *Hopkins*, 1 Munf., 419. Until set aside or cancelled in some proceeding to which Morrison is a party, his deed is an outstanding title paramount to the title of the plaintiffs, and also of Hunter, Hale and Humbird. That John Slack was the recorder of Kanawha county, sufficiently appears from the recitals in the deed and from the certificate of acknowledgment.

The motion for a new trial was properly overruled. 2 Tuck. Com., 305–6, and cases there cited.

The court was clearly right not to grant a new trial upon the affidavits of three jurors. It is not proper to penetrate the jury, and get from individual members the reasons which brought them to their conclusions. If the practice is tolerated, no verdict will stand; and the courts, in the exercise of their discretion, will not favor this practice. There was no notice given that the three affidavits would be taken, and that was a surprise. The court cannot say that the reasons which may have influenced three of the jury worked injustice.

These affidavits do not disclose any of the reasons for which new trials are properly granted. Tucker's Com., 305, 306. The court certifies that the three jurors did not correctly represent what they regarded the argument of counsel. The practice here asked to be introduced will increase tampering with jurors. 2. H. & M., 318.

New trials are not to be granted on affidavits of a part of the jury. 1 H. & M., 385; 1 T. R., 11; 1 War., 79; Tidd's Prac., 816; and the courts will rarely grant a new trial to a plaintiff in ejectment. 3 Ran., 477.

Buchanan and West, before they purchased, were chargeable with notice of the defendants' title and possession. Their deed was upon record, and they were in actual possession of the premises, claiming to be the owners. That possession was notice to the world of their actual rights

and of their nature and extent. 1 Smead & Marshall's Ch. Rep., 338 to 343, and cases there cited.

The defendants were in as purchasers from the administrator, as well as from heirs-at-law of the testator. Buchanan and West were subsequent purchasers from the same administrator, and stood in their shoes.

As such purchasers the defendants were entitled to notice to quit, and a demand of the possession before suit brought, as much as if the administrators themselves had brought the suit. See 18th Grat., on page 505, and cases cited by the court, which fully sustains the doctrine. And finally, unless it shall appear from the whole record that the plaintiffs ought to have judgment, the court will give judgment against them, and there is no difference in this respect in an appellate court and the court of original jurisdiction which gives the judgment in the first instance. *Lebret* v. *Papillon*, 4 East., 402, 405.

BERKSHIRE, *President.*

It appears that Andrew Donnally, in his lifetime, and at his death, was possessed, among other real estate, of two undivided thirds of a large tract of land in Kanawha county, containing five or six thousand acres, which formerly belonged to William Steele & Co., and was known as the "steam mill property."

One undivided third of said tract was conveyed to said Donnally by William Steele on the 14th of December, 1822, and the other by Adam and Richard Steele on the 12th of January, 1824. The remaining third of said tract had also been conveyed to said Donnally by Robert Steele and wife, but he subsequently conveyed it to John Lewis, who conveyed it to Jacob English and George H. Warth. And the tract was afterwards partitioned, at their instance, and their third, amounting to 1,783¼ acres, assigned to them.

Andrew Donnally died, perhaps, in 1850, having made and acknowledged his last will and testament, which was admitted to probate at the March term, 1850, of the county

court of Kanawha county; and the executors named in the will declining to qualify as such, administration with the will annexed was, at the same time, granted to Dryden Donnally and Andrew F. Donnally, who gave the required security and qualified accordingly.

By the 10th clause of the will the executors are authorized and required to sell certain real estate thereafter described, and including, among other tracts, the two-thirds of the steam mill property derived from the Steeles.

In 1857 the administrators, Dryden and Andrew F. Donnally, as such, and in exact conformity with the power vested in them by the will, conveyed the undivided two-thirds of said steam mill property, to James Hunter, John P. Hale and Jacob Humbird; and in 1865 they in like manner conveyed the same property to Alfred Buchanan and Charles W. West. In 1859 Dryden Donnally, Andrew F. Donnally, William Donnally, and Van Buren Donnally, all sons of the testator, Andrew Donnally, conveyed to the defendant, Ellicott Reynolds, in trust for his wife, Elizabeth Reynolds, twenty-five acres, (being the land now in controversy) of said steam mill property, who afterwards took possession of the same, and continued to hold the same, at the commencement of this suit. This suit, therefore, was instituted for the recovery of said twenty-five acres, so claimed by Reynolds and wife.

The original count was filed at February rules, 1865, and is in the name of said Buchanan and West. At the June term, 1866, the plaintiffs, upon leave, and without objection, filed an additional count in the name of John P. Hale, James Hunter and Jacob Humbird; and at the same term the case was tried and resulted in a verdict and judgment for the defendants.

The only question that it will be necessary to consider is that arising on the plaintiffs' motion for a new trial. All the facts proved in the case are certified and set out in the plaintiffs' bill of exceptions.

The legal title to the two-thirds of the steam mill prop-

erty, including the twenty-five acres in dispute, having been vested in the said Hunter, Hale and Humbird, by the deed of the administrators of Andrew Donnally, made in strict conformity to the provisions of his will, it follows that the defendants derived no title to the twenty-five acres by the deed from four of said Donnalley's heirs; and it is, therefore, clear that the plaintiffs' were entitled to recovery of the land, unless they were rightly defeated by the outstanding title in Morrison, which the defendants sought to set up against them, and for which purpose they introduced the deed from the said administrators to the said Hale, Hunter and Humbird, together with the deed of John Slack, as recorder of the county, to said Morrison for the same land, which it was claimed had been regularly returned delinquent and sold for the non-payment of the taxes charged against it for the years 1858 and 1859. The question, therefore, arises, is this deed sufficient, on its face, to vest any title to the land in Morrison the purchaser? Or, in other words, is it made to appear that the sale was made in conformity to the provisions of the law, authorizing sales to be made of land for the non-payment of taxes? In *Flanagan* v. *Grimmet and others,* 10 Grat., 421, it was held that, under the act of 1814, which required only the " circumstances of the sale," to be recited in the deed from the sheriff to the purchaser of lands sold for the non-payment of taxes, it must appear on the face of the deed that the sale was made at the *time and place* prescribed for the sale of lands returned as delinquent, though it was *not* necessary to recite therein all the steps (such as the advertisement of the officer of the time and place of sale, &c.,) which preceded such sale. That case, however, arose under the act of 1814. The sale in this case was made under the provisions of the thirty-seventh chapter of the Code of Virginia, 1860, page 217. The fourth section provides that the sales of delinquent lands shall be made at public auction, in front of the court-house of the county in which they lie, on the first day of the September or October

terms, of the county court of such county, "*between the hours of ten in the morning and four in the evening*" of such day. And by the 5th section such sales may be adjourned from day to day, *to be proceeded in between the hours aforesaid,*. until completed. The 17th section provides for the deed to be made by the clerk or deputy clerk to the purchaser, in which shall be "set forth all the circumstances appearing in the clerk's office in relation to the sale." And it is provided by the 23d section that the grantee in such deed shall stand vested with all the estate that was vested in the party assessed with the taxes, (on account whereof the sale was made) &c., "notwithstanding the irregularity of the proceedings under which the grantee claims title, *unless* such irregularity appears on the face of the proceedings."

Bringing the deed in question to these tests, it appears to me to be incurably defective, and was not, therefore, sufficient to show an outstanding title in Morrison.

It does not appear with sufficient certainty, I think, by *whom* the sale was made, nor that the land had, in fact, been assessed with taxes, nor for what year or years, nor the *amount* of taxes with which it was charged, and for which it was sold.

I think, therefore, the court erred in overruling the plaintiff's' motion for a new trial, upon the ground that the verdict of the jury was not sustained by the evidence; and also in giving the second instruction at the instance of the defendants. But, in my opinion, no error was committed in refusing a new trial upon the grounds alleged in the affidavits of the jurors.

I think the judgment should be reversed, with costs to the appellants, the verdict set aside and a new trial awarded on the usual conditions.

The other judges concurred.

JUDGMENT REVERSED.